**Affirmed and Opinion filed February 18, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00776-CV

### CITY OF LEAGUE CITY, TEXAS, Appellant

### V.

### JIMMY CHANGAS INC., Appellee

**On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Cause No. 18-CV-0818**

## O P I N I O N

In this breach-of-contract case, the City of League City contends the trial court erred in denying its plea to the jurisdiction because the City engaged in a governmental function when it entered into the contract at issue, and thus, it is immune from suit. Because we conclude that the City instead was engaged in a proprietary function in entering into the contract, we affirm the trial court's denial of the City's jurisdictional plea.

## I. BACKGROUND

In 2012, the City entered into a "Chapter 380 Economic Development Incentives Grant Agreement" with Jimmy Changas, Inc., (Changas) in which the City offered incentives to Changas to develop a restaurant within city limits. Changas later sued the City for breach of contract, alleging that it had fully performed the contract, but the City had failed to pay as agreed. Changas alleged that the City was not immune from suit because the City performed a proprietary function in entering into the Grant Agreement, or alternatively, the legislature waived the City's immunity under Chapter 271 of the Local Government Code.

The City filed a plea to the jurisdiction, later amending the plea and combining it with a motion in the alternative for summary judgment on the merits. The trial court denied the City's plea and summary-judgment motion. The City now brings this interlocutory appeal of the portion of the trial court's order denying the plea to the jurisdiction.[1]

## II. STANDARD OF REVIEW

Whether a court has subject-matter jurisdiction is a question of law that is properly asserted in a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). We review the trial court's ruling on a plea to the jurisdiction de novo. *Chambers-Liberty Ctys. Navigation Dist. v. State*, 575 S.W.3d 339, 345 (Tex. 2019). Parties may submit evidence supporting or opposing the plea, which we review under the same standard applicable to a traditional motion for summary judgment. *Id.* (citing *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016)). We take as true all evidence favorable to

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (authorizing an interlocutory appeal of an order granting or denying a plea to the jurisdiction by a governmental unit).

the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Sampson*, 500 S.W.3d at 384. If the relevant evidence fails to raise a fact question on the jurisdictional issue, the court rules on the plea to the jurisdiction as a matter of law. *Miranda*, 133 S.W.3d at 228. But if the evidence creates a fact question regarding jurisdiction, then the trial court must deny the plea to the jurisdiction and allow the factfinder to resolve the issue. *Id.* at 227–28.

### III. ANALYSIS

The state generally has sovereign immunity from suit and liability. *See Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 429–30 (Tex. 2016) ("*Wasson I*"). When political subdivisions of the state act in a governmental capacity, they share in the state's immunity, which is then referred to as governmental immunity. *See id*. But political subdivisions, including municipalities, have no inherent immunity of their own; thus, when they act in a proprietary, non-governmental capacity, they lack immunity. *See id.* The proprietary-governmental dichotomy applies to both tort and contract claims. *See id.* at 430.

Since 1987, the Texas Constitution has authorized the legislature to define which municipal functions are proprietary and which are governmental,[2] and in the Texas Tort Claims Act ("the TTCA"),[3] the legislature has set forth both general definitions and non-exclusive lists of examples. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215. Generally, governmental functions "are those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." *Id.* § 101.0215(a). Proprietary functions "are those functions that a municipality

---

[2] TEX. CONST. art. XI, § 13(a).

[3] TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–109.

3

may, in its discretion, perform in the interest of the inhabitants of the municipality." *Id*. § 101.0215(b).

In contract claims, courts are guided by the TTCA's treatment of the proprietary-governmental distinction. *Wasson I*, 489 S.W.3d at 439. If a claim against a municipality arises from its performance of a function included in one of the TTCA's non-exclusive lists of examples of proprietary or governmental functions, then we are bound by the legislature's characterization of the function. *See Ethio Exp. Shuttle Serv., Inc. v. City of Houston*, 164 S.W.3d 751, 755–56 (Tex. App.—Houston [14th Dist.] 2005, no pet.). If the function at issue is not included in one of these lists, then we apply the legislature's general definitions. To determine if the function is best characterized as proprietary or governmental under the general definitions, we consider whether the municipality's act of entering into the contract (1) was mandatory or discretionary, (2) was intended primarily to benefit the general public or the municipality's residents, (3) was on its own behalf or on behalf of the State, and (4) "was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary." *Wasson Interests, Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 150 (Tex. 2018) ("*Wasson II*") (op. on reh'g). When some of the *Wasson II* factors point to different results, "courts should consider immunity's nature and purpose and the derivative nature of a city's access to that protection." *Id.* at 154.

In its amended plea to the jurisdiction, the City challenged only Changas's pleadings, arguing that the City is presumed to be immune from suit and that Changas failed to demonstrate a valid waiver of governmental immunity. Changas alleged, both in its pleading and in response to the City's plea, that governmental immunity did not apply because the City entered into the Grant Agreement in its proprietary capacity. In the alternative, Changas argued that the City's immunity had

4

been statutorily waived. The City addressed the proprietary-function argument in its reply; thus, we will consider the evidence the parties presented on this issue to determine whether the City entered into the Grant Agreement in its governmental capacity, either because it was engaging in a function specifically identified as governmental by the legislature or because the activity is governmental under the factors stated in *Wasson II.*

## A.  The City was not engaged in a function statutorily designated as governmental.

The City first contends that it entered into the Grant Agreement in a governmental capacity because the TTCA includes among its examples of governmental functions "community development or urban renewal activities undertaken by municipalities and authorized under Chapters 373 and 374, Local Government Code." TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(34). The parties entered into the Grant Agreement pursuant to Chapter 380 of the Texas Local Government Code rather than Chapter 373 or 374, and they disagree about whether that distinction makes a difference on the facts presented here.

The City and Changas each rely on cases decided in 2018 by intermediate appellate courts who reached differing results on the question of whether a municipality has governmental immunity under section 101.0215(a)(34) from a claim that it breached an economic-development agreement pursuant to Chapter 380 of the Texas Local Government Code. *Compare City of Westworth Vill. v. City of White Settlement*, 558 S.W.3d 232, 243–44 (Tex. App.—Fort Worth 2018, pet. denied) (agreement that is not encompassed within Chapter 373 or 374 does not fall within section 101.0215(a)(34) of the TTCA) *with CHW-Lattas Creek, L.P. ex rel. GP Alice Lattas Creek, L.L.C. v. City of Alice*, 565 S.W.3d 779, 786–87 (Tex. App.—San Antonio 2018, pet. denied) (concluding that "all community

5

development activities," including agreements under Chapter 380 of the Texas Local Government Code, are encompassed by section 101.0215(a)(34) of the TTCA.

Less than a year later, the Supreme Court of Texas decided *Hays Street Bridge Restoration Group v. City of San Antonio*, 570 S.W.3d 697 (Tex. 2019). In that case, a citizen's group entered into a memorandum of understanding ("MOU") with San Antonio for an historic bridge's restoration and incorporation into a public park. *Id.* at 700. San Antonio obtained a federal grant administered by the Texas Department of Transportation and agreed with the Department to fund 20% of the project's cost. *Id.* at 700–01. Pursuant to the MOU, the citizen's group arranged for funds, the bridge itself, and adjacent real property to be contributed to San Antonio for the project. *See id.* The bridge was restored, but contrary to the MOU's terms, San Antonio arranged to sell it to a brewery. *Id.* at 701. The citizen's group sued for specific performance, and San Antonio claimed governmental immunity under section 101.0215(a)(34) of the TTCA, as well as under subsection (a)(4) (defining "bridge construction and maintenance" as a governmental function). *Id.* at 705. The Supreme Court of Texas agreed that both provisions applied. *Id.*

The City relies on the following footnote from *Hays Street Bridge*:

Section 101.0215(a)(34) lists "community development or urban renewal activities undertaken by municipalities *and authorized under Chapters 373 and 374, Local Government Code*". The [petitioner] argues that this limitation renders the provision inapplicable here. Because we consider the Legislature's classification of governmental and proprietary functions in the Tort Claims Act to be guidance in the contract-claims context—rather than binding lists to be interpreted narrowly—we disagree.

*Id.* at 705 n.46 (citations omitted; emphasis in original).

The City interprets this footnote to mean that all municipal economic-development agreements are encompassed by section 101.0215(a)(34) of the TTCA,

6

as the Fourth Court of Appeals held in *CHW-Lattas*. But the Supreme Court of Texas did not say that a municipal economic-development agreement necessarily falls *within* the scope of this subsection; rather, the court rejected the argument that an economic-development agreement that is not governed by Chapter 373 or 374 of the Texas Local Government Code necessarily falls *outside* the scope of subsection (a)(34). *See id.*

The high court said that determining whether a municipality is performing a governmental or proprietary function requires two steps. First, we look at whether the enumerated lists in § 101.0215 include the kind of contract at issue. If not, then we apply the general definitions using the *Wasson II* factors. *See Hays Street Bridge*, 570 S.W.3d at 704–05. In *Hays Street Bridge*, the court found that the bridge fell within two governmental functions, those being "bridge construction and maintenance" and the second being the one at issue in this section of the opinion: "community development or urban renewal activities" under section 101.0215(a)(34). *Id.* at 705 & n.46. The reason for the ruling is found earlier in the paragraph in which the footnote appears: "The MOU was made to support *the City–State funding agreement* for restoration of the Bridge and revitalization of the surrounding area." *Id.* at 705 (emphasis added). Thus, the restoration project was largely state-funded, and San Antonio's immunity was derived from the State.

Despite having held that the bridge project fell within the enumerated governmental functions, the court nevertheless proceeded to the second step, applying the general definitions under the *Wasson II* factors. The court found that the bridge-restoration project was a governmental function under the general definitions as well, again emphasizing that "[e]ighty percent of the restoration project was funded by the Texas Department of Transportation." *Id.* at 706.

7

*CHW-Lattas* rested on a different rationale, which we do not find persuasive. The authoring court relied on the legislative history for subsection (a)(34), quoting a bill analysis in which the House Committee on Civil Practices wrote, "lawsuits against municipalities relating to community development activities diminish the funds available for projects within the municipality." *CHW-Lattas*, 565 S.W.3d at 786 (quoting House Comm. on Civil Practices, Bill Analysis, Tex. H.B. 2766, 75th Leg., R.S. 1997). The *CHW-Lattas* court held that "[t]he logic for the amendment . . . extends to all community development activities regardless of which chapter of the Local Government Code applies." *Id.* But, *all* "lawsuits against municipalities . . . diminish the funds available for projects within the municipality," regardless of whether the suit is related to community-development or urban-renewal activities. Thus, the only apparent reasoning for limiting subsection (a)(34)'s application to community-development or urban-renewal activities is because the limitation is found in the statutory amendment itself. And, regardless of the broad language in the bill analysis, the legislature defined as a governmental function only a municipality's community-development or urban-renewal activities "authorized under Chapter 373 and 374, Local Government Code." TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(34).

There are important differences between community-development programs under Chapters 373 and 374 and those under Chapter 380. Chapter 373 programs are designed to improve the living and economic conditions of people with low and moderate income, benefit low- and moderate-income neighborhoods, aid in preventing or eliminating slums and blighted areas, aid a federally assisted new community, or meet other urgent community-development needs. TEX. LOC. GOV'T CODE ANN. § 373.004. Programs under Chapter 374 more specifically target the prevention and elimination of slums and blighted areas. *See id.* § 374.002. In

contrast, programs under Chapter 380 are designed "to promote state or local economic development and to stimulate business and commercial activity in the municipality." *Id.* § 380.001(a).

In sum, the legislature has established municipalities immune from suit for the alleged breach of agreements implementing community-development programs to improve the lives of those of low and moderate income, and the Supreme Court of Texas has extended that immunity to a suit against a municipality for the alleged breach of an agreement for a community-development program that was largely state-funded. Because none of those situations apply to the agreement at issue in this case, we conclude that, in entering into the agreement, the City was not engaged in a governmental function within the scope of section 101.0215(a)(34).

## B. The City was not engaged in a governmental function under the *Wasson II* test.

We next determine whether the City was engaged in a governmental function as measured by the *Wasson II* factors. Of the four factors—mandatory v. discretionary; primarily benefiting the general public v. primarily benefiting the municipality's residents; acting on its own behalf v. acting on the State's behalf; and sufficiently related to a governmental function—the City has briefed only the second factor.

According to the City, Changas admits that the Grant Agreement was intended to benefit the general public. Changas does not admit this; rather, the City has inferred that Changas agrees with its assessment merely because Changas admits that (1) the agreement did not require Changas to hire only City residents, (2) a job applicant's residency inside or outside the city limits was not a factor in Changas's hiring decisions, and (3) Changas remits the sales taxes it collects to the State of

9

Texas. None of these "admissions," individually or collectively, support the City's conclusion.

That the agreement did not require Changas to hire only municipal residents says nothing about whether the City was performing a governmental or proprietary function in entering into the agreement. As the Supreme Court of Texas explained in *Wasson II*, "A city's proprietary contracts will often benefit some nonresidents, and its governmental contracts will often benefit some residents, but whether a contract *primarily* benefits one or the other will often indicate whether it is proprietary or governmental." *Wasson II*, 559 S.W.3d at 151.

The remaining two "admissions"—that Changas did not consider residency status in its hiring decisions and that it remitted sales tax to the State—do not affect our analysis. Information regarding Changas's hiring practices after it entered into the agreement are irrelevant, because whether a municipality was engaged in a governmental function is determined as of the time the municipality entered into the contract. *Wasson II*, 559 S.W.3d at 149. Changas's subsequent actions shed no light on the nature of the function *the City* was performing *when it entered into the agreement*. The fact that Changas remitted sales tax to the State[4] sheds no light on that inquiry, because sales taxes can apply to both governmental and proprietary functions.[5] It is likely for this reason that payment of state sales taxes do not appear as a factor in the case law regarding the proprietary-governmental dichotomy.

---

[4] State and municipal taxes are collected together and administered by the state comptroller. *See* TEX. TAX CODE ANN. § 321.301.

[5] For example, both garbage removal and the operation of amusements are taxable, though the former is a governmental function and the latter is a proprietary function. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(6) (garbage and solid waste removal are governmental functions); *id.* 101.0215(b)(2) (owning and operating amusements are proprietary functions); TEX. TAX CODE ANN. §§ 151.0048(a)(3), 151.0101(a)(11) (real property services, which include garbage removal, are taxable); *id.* § 151.0101(a)(1) (amusement services are taxable).

10

Moreover, Changas would have had to pay state sales tax regardless of where in Texas it located the restaurant, but as the parties memorialized in their agreement, the City expected that locating the restaurant in League City would generate $105,000 annually in municipal sales tax.

What is most illuminating, however, is the language of the agreement itself. It states,

> [T]he City is authorized, pursuant to Chapter 380 of the Texas Local Government Code, to establish and provide for the administration of one or more programs . . . to promote state *or local economic development and to stimulate business and commercial activity in the City*; and . . .
>
> [T]he City believes the development contemplated by [Changas] *will contribute to the economic development of the City by generating employment and other economic benefits to the City*.

Finally, the City argues that Chapter 380 was enacted pursuant to article III, section 52-a, of the Texas Constitution, which provides that "the legislature may provide for the creation of programs and the making of loans and grants of public money . . . for the public purposes of development and diversification of the economy of the state." But in enacting Chapter 380, the legislature broke this overarching state purpose into smaller, "local" bites. Thus, Chapter 380 states, "The governing body of a municipality may establish and provide for the administration of one or more programs . . . to promote state *or local economic development* and *to stimulate business and commercial activity in the municipality*." TEX. LOC. GOV'T CODE ANN. § 380.001 (emphasis added). We therefore conclude that the agreement at issue here was primarily intended to benefit the City, and thus, the second *Wasson II* factor weighs in favor of characterizing the City's action in entering into the agreement as proprietary.

Because the City has offered no argument on the remaining factors, we address them only briefly. As for the first and third factors, it is undisputed that the City had discretion to enter into the agreement and that it did so on its own behalf. Regarding the fourth factor, the City asserts that act of entering into the agreement was closely related to the governmental function of community development, but the City has offered no supporting argument. The City maintains only that entering into a community-development agreement under Chapter 380 was itself a governmental function; it does not contend that entering into such an agreement, if proprietary, was nevertheless essential to some other governmental action. *See Wasson II*, 559 S.W.3d at 153 ("[A] city's proprietary action may be treated as governmental only if it is *essential* to the city's governmental actions.") (emphasis added).

Because all four *Wasson II* factors indicate that the City performed a proprietary function in entering into the agreement, we conclude that governmental immunity does not apply. We overrule the sole issue presented.

## IV. CONCLUSION

Having concluded that governmental immunity does not apply, we affirm the trial court's denial of the City's plea to the jurisdiction without addressing the City's arguments concerning waiver of immunity.

/s/     Tracy Christopher
Chief Justice

Panel consists of Chief Justice Christopher and Justices Jewell and Hassan.